MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
BALTIMORE STEAM PACKET COMPANY.
[No. 101, October Term, 1932.]

*Decided March 1st, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Paul F. Due, Deputy City Solicitor,* and *S. Wilmer Pleasants, Assistant City Solicitor,* with whom was *R. E. Lee Marshall, City Solicitor,* on the brief, for the appellant.

*Philip B. Perlman,* with whom were *Watson E. Sherwood* and *August A. Denhard* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The question in this case is whether, under a grant by the city to the Steam Packet Company of a right to the exclusive possession and use of a wharf in Baltimore City for a term of fifty years, at a stipulated annual compensation, payable in quarterly installments, the company was bound to pay the compensation during the whole of the term stated, or was rendered only a licensee, or holder of a privilege which it might surrender at will, terminating the liability for payments, before the expiration of the fifty years. The city has sued the company for installments unpaid after an attempted abandonment of the wharf by the company, and the company

has demurred to the claim. The court of first instance has sustained the demurrer, judgment on the demurrer for the defendant has been entered, and the city appeals.

The facts alleged, together with the relevant provisions of the city charter, of which judicial notice is to be taken, are these. Section 7 of the charter (Code Pub. Loc. Laws, art. 4, sec. 7) provides that the title of the city in and to its water front, wharf property, land under water, public landings, wharves and docks, highways, avenues, streets, lanes, alleys, and parks is inalienable. Section 8 provides that the city may grant for a limited time, and subject to the limitations and conditions contained in the charter, specific franchises or rights in or relating to any of the public property or places mentioned in section 7, the terms and conditions of the grant to be set forth in an ordinance duly passed, specifically stating the nature, extent, and duration of the franchise or right granted. In section 37 it is repeated that the grant of the franchise or right for the use of any public property mentioned in section 7 shall, with some exceptions, be embodied in an ordinance with all the terms and conditions required by the charter, and such others as may be right and proper. Section 37A follows with the provisions referring more particularly to grants of franchises or rights in water front, wharf property, land under water, public landings, wharves, or docks; and its requirements differ in some respects from the requirements in the preceding sections. It gives the city government power to grant franchises or rights in its wharf property, and to fix the compensation for a franchise or right at such sum as shall be deemed reasonable and adequate, and to prescribe the terms and conditions of the grants. And it provides that the ordinance granting a franchise or right in any public property mentioned in the section shall make the grant for compensation, and upon terms and conditions, and to a grantee or grantees, approved by the board of estimates of the city, the approval to be entered on the minutes or records of the board and attached to the ordinance. It therefore appears that the grants are to be

embodied in and accomplished by municipal ordinances, with the terms and conditions set forth in them, including the compensations fixed, and, under section 8, the duration of the franchises or rights granted.

An ordinance was passed in 1910 granting exclusive use to the Steam Packet Company, for a period of fifty years, as previously stated, of part of Pier No. 5, which was the property of the city, and it prescribed the terms, conditions, and duration of the grant and the compensation to be paid for it, in apparent conformity with the sections of the charter just reviewed. The grantee, its successors and assigns, were given the right to erect a pier superstructure of prescribed design. The compensation was fixed at an annual rental payable in quarterly installments, calculated at a rate per square foot of space on the pier; and this was to be paid "during the life of the grant hereby made, as hereinafter mentioned." The rental was to be subject to increase to equalize it with rentals subsequently charged for other piers, and it was provided "that upon the expiration of every recurring period of ten years, during the life of the grant hereby made," there should be a revaluation and adjustment of the compensation to be paid, but never a reduction below the amount of the original rental; and the new amount was to be fixed by agreement or by arbitration. The grantee, its successors or assigns, were to keep the improvements insured, to keep the premises in good condition and the water free from dirt from the pier. "At the expiration of its occupancy" the grantee was required to yield up the property peaceably, in good order. Assignment of the grant without the consent of the members of the board of estimates was prohibited, unless to some person or corporation succeeding to ownership of the majority of the stock of the grantee or of its property; and sub-assignment of part of the pier without like consent in writing was also prohibited.

Section 3 of the ordinance contained a provision that "the rights and franchises herein granted shall be held, exercised and enjoyed by the said company for the period of fifty years,

subject to all the terms and conditions mentioned herein * * * and that upon the termination of this grant, all improvements, superstrutcures, foundations, etc., erected on said Pier No. 5, by said Baltimore Steam Packet Company, its successors or assigns, shall be and become the property of the city, and no compensation shall be paid therefor." A right to tax the improvements was reserved. And a clause for forfeiture was added: "That upon the failure of the said grantee, its successors or assigns to comply with any of the terms and conditions of this ordinance, the rights, privileges and franchises hereby granted shall be and become wholly void."

It was alleged that the grantee duly accepted all the terms and conditions of the ordinance, and entered into possession of the pier, and continued in possession until July 1st, 1932, paying the annual sum or compensation, with an increase agreed upon after the first two ten-year periods. But on July 1st, 1932, the grantee notified the city that it had abandoned the premises, claiming a right to terminate at will its use and occupation, and its obligation to pay compensation therefor, and that it would make no more payments; and accordingly it did on July 1st, 1932, fail and refuse to pay a quarterly installment then due, if the relationship continued.

The provision for forfeiture that, upon failure of the grantee, its successors or assigns, to comply with any of the terms and conditions of the ordinance, the rights, privileges, and franchises granted should become void, is urged as having brought about a termination of the grant, or of the relationship under it, on the date of the failure to pay, even if the city's contention for continuation otherwise should be correct. But this is only one of the instances of provisions for forfeiture which, though absolute in terms, are to be regarded as giving a right to the party entitled to performance, or an option, to terminate. Similar clauses are common in leases by private owners of property, and are regarded as being intended to give such an option. *Morrison v. Smith,* 90 Md. 76, 83, 44 A. 1031; *Western Bank v. Kyle,* 6 Gill,

343, 349. Unless the grantee has the privilege of abandoning the possession and the obligation to pay, the obligation continued, for the city has not elected to avoid it.

The question of the existence of the obligation on and after July 1st, 1932, has been argued to some extent as a question of the nature and classification of the right granted, that is, as a question whether the grant amounted to a bilateral contract or lease, or gave only a franchise or license to be used or disused at the grantee's option; but it seems that it is, ultimately, only a question whether the parties intended that the obligation should be so continued during the period specified. The customary practice with respect to grants of these several forms of right, leases, or grants of franchises or licenses may, perhaps, afford some aid in inferring the intention in this grant, but there is nothing inherent in any of the forms which forbids the attaching of an agreement that the rights and obligations on both sides should continue for a determinate period. Possibly the addition of such an agreement might have the effect of changing the form and proper classification, but, if so, the form and classification would be deduced from the intention; and the intention is therefore the ultimate guide. We do not understand it to be questioned, indeed, that however the nature of the grant or the right under it might ordinarily be described, if the parties had desired it, they could have imposed an obligation on the grantee to pay throughout the designated term, or, on the other hand, could have vested in it a mere option, privilege, or license to occupy and pay during so much of that term as it might wish. The charter right of the city to attach terms and conditions to franchises or rights of any kind granted by it is not limited, and, of course, the power of the grantee to accept obligations with respect to payments of compensation is not limited. 3 *Dillon, Munic. Corp.,* sec. 1229. And, when an intention one way or the other is found manifested, then it could not be frustrated by forms or classification. This would be true of an intention to enter into a lease, if such intention were found to exist. "An instrument

of lease which satisfies the requirements as to execution need not follow any particular form, it being sufficient that it show an intention on the part of the lessor, by the making thereof, to dispossess himself of the tenements in question in favor of the lessee." 1 *Tiffany, Landlord & Tenant,* p. 264. "Any phraseology will establish the fact of tenancy from which it appears to have been the intention of one of the parties to dispossess himself of the premises (for a consideration) and of the other to assume the possession for any determinate period, whether words used are in the form of a license, a covenant, or an express agreement." 1 *Taylor, Landlord & Tenant,* sec. 26.

The appellee regards the absence of a writing signed by it as largely decisive of the nature and extent of this grant, and of the intention of the parties as to continuation of the holding under it. The argument is that, if the grant bound the grantee to continue the payments, it must be because it constitutes a lease, and, as a lease is ordinarily embodied in a written instrument signed by the lessee, and, when for a term of more than seven years, is required by the Code, art. 21, sec. 1, to be acknowledged and recorded, the absence of any such writing in this instance evidences an absence of intention to make a lease, or to bind the grantee to an obligation through the designated term as only a lease would bind it. The contention seems to overlook a difference between a grant by a governmental corporation and a lease by a private individual. Even if the city, in contracts or leases concerning city property, should be required to adhere to the methods prescribed for private dealers in property, the absence of a signature by a lessee might be unimportant after that lessee had accepted possession and assumed the relation of tenant. *Bonaparte v. Thayer,* 95 Md. 548, 52 A. 496; *Guilford Bldg. Co. v. Goldsborough,* 140 Md. 159, 162, 116 A. 913; *Starwich v. Washington Cut Glass Co.,* 64 Wash. 42, 116 P. 459. 1 *Tiffany, Landlord and Tenant,* sec. 53b. And this grant, whether it be classed as one of lease or one of an optional license or privilege, or otherwise, is made under and in accordance with a statute prescribing a mu-

nicipal ordinance as the regular and sufficient means of accomplishing the purpose. A municipal corporation, when permitted by its charter, may make contracts by ordinance. Its legislative power is sufficient to establish the rights and obligations desired, and may be resorted to for the purpose. *Dillon, Munic. Corp.*, sec. 784; *Westminster Water Co. v. Westminster*, 98 Md. 551, 554, 56 A. 990; *St. John's College v. State*, 15 Md. 330; *Davis v. Gray*, 16 Wall. 203, 21 L. Ed. 447. Grants of interests in land and riparian rights by the process of legislation have long been familiar. *City of Baltimore v. White*, 2 Gill, 444; *Chesapeake & O. Canal Co. v. Railroad Co.*, 4 G. & J. 128; *Horner v. Pleasants*, 66 Md. 475, 7 A. 691; *Shively v. Bowlby*, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; *United States v. Denver & R. G. R. Co.*, 150 U. S. 1, 14 S. Ct. 11, 37 L. Ed. 975, and *Id.*, 150 U. S. 16, 14 S. Ct. 16, 37 L. Ed. 980; *Seaboard Air Line R. Co. v. Board of Bond Trustees*, 91 Fla. 612, 108 So. 689; 2 *Lewis' Sutherland, Statutory Construction*, secs. 550, 558. And there are to be found instances of leases by legislative process. *San Francisco & O. R. Co. v. City of Oakland*, 43 Cal. 502. And see *Mackin v. City of Chicago*, 93 Ill. 105. Therefore the lack of an ordinary writing, recorded as required by article 21 of the Code, does not aid in ascertaining the intention and effect of the present grant. Ordinances granting rights in wharf property, this court has said, "disclose everything in relation to the wharf, as fully as if its construction and use had been provided for in a patent from the Land Office, or by deed duly executed, acknowledged and recorded among the land records." *City of Baltimore v. White*, 2 Gill, 444, 457.

But, even if the grant should contain all the other elements which the appellee thinks necessary to an effectual lease, if there is manifested an intention that the grantee shall be privileged to abandon its possession and liability for rentals before the expiration of the fifty years, as, for instance, by an explicit stipulation to that effect, then, whatever may be the form or correct classification of the grant or the rights under it, the grantee is not required to continue

its possession and payments. And, on the other hand, if it is manifested that the intention was that the grantee should continue its possession and payments to the end of the fifty years, then such is the term or condition of the grant which it took upon itself in accepting the grant, whatever the classification of the right granted. Acceptance of rights or franchises includes acceptance of the conditions imposed. 4 *McQuillin, Munic. Corp.,* secs. 1777 and 1803; 3 *Dillon, Munic. Corp.* (5th Ed.), sec. 1229.

The ordinary piers belonging to the city are in a material respect unlike the streets and other property to be maintained for the general public use. Held in what has been distinguished as the private ownership of the city, they are available to be given over into exclusive private use, for the purpose of raising revenue. "But the right to construct wharves is not held by the municipal corporation in its public or governmental capacity; the erection and maintenance of such structures are merely a business enterprise in regard to which the municipality acts in its private capacity." *Farnham, Waters, sec.* 123A; *Dyer v. Baltimore* (C. C.), 140 Fed. 880. And city piers are commonly leased to private occupants for that purpose. *In re Mayor etc. of City of New York,* 135 N. Y. 253, 31 N. E. 1043; *Morgan City v. Dalton,* 112 La. 9, 36 So. 208; *Balto. & Phila. Steamboat Co. v. Starr M. P. Church,* 149 Md. 163, 130 A. 46; *Baltimore City v. Steamboat Co.,* 104 Md. 485, 488, 65 A. 353. The grant of such property is not a grant of a privilege of exercising a calling by the grantee on property maintained for general public use, usually termed a license or franchise. 1 *Dillon, Munic. Corp.* (5th Ed.), sec. 363. It is ordinarily a bilateral dealing such as private owners might engage in. And it seems at the outset that, engaged in the same utilization of the public property as private parties commonly engage in with private property, the parties to this grant probably intended to deal in the habitual, conventional manner, with the grantee bound to the whole of the specified term.

Consistently with this inference, we find it expressly stipulated in section 3 of the ordinance that the exclusive posses-

sion and other rights granted "shall be held, exercised and enjoyed by the said company for the period of fifty years subject to the terms and conditions mentioned." The duties imposed on the company, including that of making the payments, are expressly required to be performed "during the life of the grant." The requirement as to payments is, more particularly, that they shall be made "during the life of the grant hereby made, as hereinafter mentioned"; and the further mention of the manner of payments includes the provision for revaluation and adjustment of rent or compensation at the end of every ten-year period.

These indications are not many, and they are less definite than might be desired in respect to the undertaking of the company. Nevertheless, such as they are, they seem to this court to manifest an intention that the company should undertake the possession and the payments for the full term of fifty years. And for that reason we find it necessary to reverse the ruling on the demurrer.

*Judgment reversed, and case remanded for further proceedings, with costs.*